IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 16, 2024 Session

**FOOTHILLS LAND CONSERVANCY v. CREEKSIDE ESTATES
PARTNERSHIP, ET AL.**

**Appeal from the Chancery Court for Knox County**
**No. 202559-1      John F. Weaver, Chancellor**

_____

**No. E2023-01647-COA-R3-CV**

_____

This case involves dueling declaratory judgment actions arising out of a deed of conservation easement dated December 31, 2007, encumbering property located within the Town of Farragut in Knox County. The trial court found in favor of Foothills Land Conservancy and awarded the nonprofit its damages, expenses, and attorneys' fees. Upon review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Lewis S. Howard, Jr. and Erin J. Wallen, Knoxville, Tennessee, for the appellant, Creekside Estates Partnership.

W. Morris Kizer, Knoxville, Tennessee, for the appellee, Foothills Land Conservancy.

Matthew A. Grossman and Richard E. Graves, Knoxville, Tennessee, for the appellees, Chad A. Lankford and Bianca B. Lankford.

**OPINION**

**I. BACKGROUND**

Foothills Land Conservancy ("Foothills") is a tax-exempt nonprofit Tennessee corporation and is a "qualified organization" under Sections 501(c)(3) and 170(h) of the Internal Revenue Code. Its primary purpose is to preserve land, water, air, wildlife, scenic

quality, and open space by implementing programs for protecting unique or rare natural areas, waterfront, stream corridors, and watersheds, primarily through accepting grants of conservation easements and enforcing their terms.

Placemakers Partnership[1] ("Placemakers") was a Tennessee general partnership and the owner of a 42.46 acre tract of real property located in the Town of Farragut, Knox County, with an address of 600 McFee Road ("Property"). The Property comprised Phase II of a residential, single-family development known as Bridgemore, which phase was approved for construction of seventy to eighty houses. In 2007, the partners of Placemakers, who included attorney David Long, undertook to sell the Property portion of Bridgemore. Long discussed the sale with Joseph K. Ayres, who indicated an interest in developing large, estate lots, rather than seventy to eighty smaller lots, on the Property in conjunction with a conservation easement. Long introduced Ayres to William Clabough, Foothills' Executive Director. After Long prepared the legal documents for both Placemakers and Foothills, Ayres purchased a 99.8% partnership interest in Placemakers with the intent that Placemakers execute a Deed of Conservation Easement ("Easement") for the purpose of obtaining a deduction on its 2007 federal income tax return for a charitable contribution of a conservation easement. Ayres became the managing partner of Placemakers and signed a "Baseline Documentation" report containing baseline data regarding the Property. Long, at various times, acted as a partner of and legal counsel to Placemakers, a member of the Foothills Board of Directors and legal counsel thereto, and legal counsel to Creekside and Ayres.

The Tennessee Conservation Easement Act of 1981, Tennessee Code Annotated section 66-9-301, *et seq.* ("Conservation Easement Act"), defines a conservation easement as a nonpossessory interest in real property imposing limitations or affirmative obligations on the owner of the land, its heirs and assigns, with respect to the use and management of the land, structures, or features thereon, which limitations and affirmative obligations are intended to preserve, maintain, or enhance the present condition, use, or natural beauty of the land, the open-space value, the air or water quality, the agricultural, forest, recreational, geological, biological, historic, cultural or scenic resources of the land. As the "donee" of the Easement, or as the "Holder" as that term is used in the Conservation Easement Act, Foothills is required, both by law and by contract, to enforce the limitations and affirmative obligations of the document so as to preserve, maintain, or enhance the natural beauty, the open-space value, the air and water quality, and the scenic resources of the land. Pursuant to the terms and conditions of the Easement, Foothills is required to undertake this enforcement obligation in perpetuity.

The Easement before us states that the grant of the conservation easement on the Property was intended by Placemakers and Foothills to be a "qualified conservation

---

[1] Creekside Estates Partnership ("Creekside"), a Tennessee general partnership, is successor in interest to Placemakers, having acquired the property by quitclaim deed dated April 10, 2018.

- 2 -

contribution under the [Internal Revenue] Code and 26 C.F.R. Section 1.170A14…" (the "Regulations") governing tax deductible conservation easement donations. The Easement states that the "Purpose" (as opposed to the Conservation Purposes) of the Easement is as follows:

> It is the purpose of this Easement to assure that the Property will be retained forever in its undeveloped, natural, scenic, forested and/or open land condition and to prevent any use of the Property that will impair or interfere with the Conservation Values of the Property, subject only to the terms and provisions set forth herein.

The Easement defines "Conservation Values" as the "ecological, natural, scenic, forested land, and wildlife habitat values" possessed by the Property (collectively, "Conservation Values") and provides that "the specific Conservation Values of the Property are further documented in" the Baseline Documentation.

Under the Regulations, a perpetual easement on real property is a "qualified real property interest," and an income tax deduction may be allowed for the value of a qualified real property interest, including a conservation easement, granted to a qualified organization such as Foothills if the easement is perpetual and is "exclusively for conservation purposes." The Regulations define the term "conservation purposes" to include the following:

> The protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem…

> The preservation of certain open space (including farmland and forest land), if such preservation is…

> Pursuant to a clearly delineated Federal, state, or local governmental conservation policy and will yield a significant public benefit…, or

> For the scenic enjoyment of the general public and will yield a significant public benefit.

Placemakers as "Grantor" and Foothills as "Grantee" incorporated in the Easement the foregoing conservation purposes stated in the Regulations and agreed that those conservation purposes would be served by preservation of the Property, as follows:

> WHEREAS, preservation of the Property shall serve the following purposes (the "Conservation Purposes"):

> Preservation of the Property as a relatively natural habitat of fish, wildlife, or

plants or similar ecosystems; and

Preservation of certain open space (including farmland and forest land) where such preservation is for the scenic enjoyment to the general public and will yield a significant public benefit; and

Preservation of certain open space (including farmland and forest land) where such preservation is pursuant to a clearly delineated Federal, State or local governmental conservation policy and will yield a significant public benefit; and

WHEREAS, Grantor and Grantee desire to perpetually conserve the natural, scientific, educational, open space and scenic resources of the Property to accomplish the Conservation Purposes; and

WHEREAS, Grantor intends to grant the easement and impose the restrictive covenants on the Property as set forth in this Easement to accomplish the Conservation Purposes.

The requirement of the Regulations that the grant of a conservation easement must be "exclusively for conservation purposes" does not preclude the reservation by the donor of certain limited rights, but only if such reserved rights "conform to the requirements of" the Regulations. The Regulations state that "a deduction will not be allowed for the preservation of open space . . . if the terms of the easement permit a degree of intrusion or future development that would interfere with the essential scenic quality of the land or with the governmental conservation policy that is being furthered by the donation." The Regulations further denote that a contribution made for the preservation of open space for the scenic enjoyment of the general public will qualify for a deduction if, without the conservation restriction, "development of the property would impair the scenic character of the local rural or urban landscape or would interfere with the scenic panorama that can be enjoyed from a park, nature preserve, road, waterbody, trail, or historic structure or land area, and such area or transportation way is open to, or utilized by, the public." The Regulations indicate that "a deduction will not be allowed if the contribution would accomplish one of the enumerated conservation purposes but would permit destruction of other significant conservation interests." The Regulations additionally require affirmative steps for the "[p]rotection of (the) conservation purpose where a taxpayer reserves certain rights," noting that if any reserved rights "may impair the conservation interests associated with the property," the donor must provide baseline documentation "designed to protect the conservation interests associated with the property, which although protected in perpetuity by the easement, could be adversely affected by the exercise of the reserved rights." By making the Easement pursuant to the Regulations, Placemakers and Foothills incorporated the provisions of the Regulations limiting the exercise of any development rights reserved by Placemakers.

Under the Regulations, the Internal Revenue Service ("IRS") would allow an income tax deduction for the grant of a conservation easement only if the grant is found by the IRS to be "exclusively for conservation purposes," requiring a finding that "any rights reserved by the donor … conform to the requirements of …" the Regulations. As required by 26 U.S.C. section 170, Placemakers submitted to the IRS the "Market Value Appraisal" prepared by Robert J. Fletcher ("Appraisal"), the purpose of which was "to evidence and support the value of a charitable donation of a conservation easement." The Appraisal valued the Property before the grant of the conservation easement at $4,200,000.00, and after the grant of the conservation easement, and as restricted thereby, at $475,000.00. The "after" value of the Property was 11.3% of the "before" value. After reviewing the Appraisal, and without requesting any changes to it, Ayres signed Placemakers' 2007 federal income tax return under penalty of perjury, wherein Placemakers claimed the $3,725,000.00 deduction.[2]

As part of the Appraisal, Fletcher included a map labeled "Potential Lot Layout." Ayres asserted that this Potential Lot Layout did not represent the development plan of Placemakers as of December 31, 2007; he claimed that he would "consider this one of many different possibilities." Creekside, however, acknowledged that the Potential Lot Layout was provided to Fletcher by Placemakers for use in the Appraisal, that the Potential Lot Layout was in the Appraisal when Ayres reviewed it, that Ayres requested no changes to the Appraisal, and that the Potential Lot Layout was the future development plan "taken into account" by Fletcher in his "after" valuation of the Property and was submitted as part of the Appraisal to the IRS to evidence and support the tax deduction. The Potential Lot Layout depicts a type of development of the Property identified at trial as a "clustered" type development (concentrated with houses close together), with ten "Single Family Lots" located around two cul-de-sacs, with each cul-de-sac having five lots clustered around it, and with the ten lots containing a combined total of 2.71 acres. The Potential Lot Layout included in the Appraisal also shows a right of way ("ROW") area of 4.03 acres, and a "conservation easement" area of 35.49 acres.

Among the reserved rights stated in Section 4 of the Easement is the conditional right to construct up to ten single family dwellings on up to ten "Residence Structure Areas" on the Property ("RSAs"), together with other accessory improvements, driveways, and underground utilities to service the residence structures, subject to Foothills' approval. The conditions stated in Subsections 4(d)(i)-(iii) of the Easement require that the location and dimensions of each RSA and the location and dimensions of a road or driveway and underground utility facilities proposed to serve each RSA shall have been reviewed and approved by Foothills. The approval is not to be unreasonably withheld or delayed, and the location of the RSAs, and the location and dimension of the roads, driveways, and underground utility facilities "must not, in (Foothills') reasonable judgment, result in any

---

[2] The tax return included copies of the Easement and the Appraisal.

material adverse effect on any of the Conservation Purposes or Conservation Values." The final paragraph of Section 4(d) of the Easement permits Placemakers to construct, in compliance with the requirements of the Easement, a single family dwelling within each of the RSAs along with other ancillary buildings thereto, such as garages, swimming pools, tennis courts, pool houses, outdoor fire places, gazebos, garden sheds, and other similar structures, provided that the dwelling houses and the other structures "must not unreasonably interfere with the Conservation Values of the Property."

As required by the Regulations, the Easement contains numerous provisions limiting and restricting the exercise of Placemakers reserved rights in general, including the right to build the RSAs and ancillary structures in particular. Those include the prevention of any use of the Property that will impair or interfere with the Conservation Values of the Property, subject only to the terms and provisions of the Easement, and allows only such activities that are not inconsistent with the Conservation Purposes of the Easement. The Easement explicitly provides that there is no assurance that the reserved rights for which Foothills' consent is required may be exercised in the manner proposed by Placemakers, and that the reserved rights for which Foothills' consent is required may not be exercised unless and until Foothills is satisfied that the exercise of the reserved right in the manner proposed by Placemakers can be done without an adverse or detrimental effect on the Conservation Purposes, Conservation Values, or other significant ecological values of the Property, or prohibited by or inconsistent with the restrictions set forth in the Easement.

Section 5(a) of the Easement applies to requests by Placemakers for the exercise of reserved rights. It requires Placemakers to notify Foothills thirty days prior to undertaking an activity, giving notice of the nature, scope, design, location, timetable, and any other material aspect of the proposed activity in sufficient detail to permit Foothills to make an informed judgment as to its consistency with the purposes of the Easement, and, as required by 26 C.F.R. section 1.170A-14(g)(5)(ii), to give notice in writing before exercising any reserved right that may impair the conservation interests associated with the Property. Section 5(b) of the Easement sets forth the requirements for Foothills to respond to a "written request" from Placemakers given in accord with Section 5(a):

> Grantee's Approval. When Grantee's approval is required, as set forth in Paragraph 3(c) or Paragraph 4, Grantee shall grant or withhold its approval in writing within thirty (30) days of receipt of Grantor's written request therefor. Grantee's approval may be withheld only upon a reasonable determination by Grantee that the action as proposed would be inconsistent with any of the conservation purposes of this Easement, detrimental to the Conservation Values of this Easement, prohibited by or would be inconsistent with the restrictions set forth in this Easement. If Grantee does not approve or withhold approval of the requested action within thirty (30) days of receipt of Grantor's written request therefor, Grantee is deemed to

have granted approval of such requested action and Grantor is expressly authorized to proceed therewith EXCEPT WHERE the requested action is clearly prohibited by the terms of this Easement or would be clearly destructive of the Conservation Purposes. (Capital letters in the original; emphasis added.)

In a May 1, 2017 email to Long, Ayres declared, despite having submitted the Appraisal to the IRS with a development plan of ten lots totaling 2.71 acres, "I know we will need to submit something to Foothills for approval but we were hoping we could maximize our deedable acreage to potential purchasers." Later that year, Long sent a memorandum to Foothills' Land Protection Committee ("LPC") asserting that "Ayres was advised by the Town of Farragut earlier this year that cluster/planned unit development type housing would more than likely not be approved; hence, Placemakers Partnership's proposal to come up with alternative plans for 8 to 10 house sites for both the Town of Farragut and (Foothills) to approve." Contrary to Long's assertions, Mark Shipley, the Town of Farragut's Community Development Director, testified that the Potential Lot Layout included in the Appraisal, an example and depiction of a "type of clustered housing," was encouraged at that location, and that there would not be a minimum lot size for a clustered development on the Property. However, after Long's assertions, further discussions regarding clustering were dropped.

Between September 13, 2017, and October 19, 2017, Ayres sent three maps to Long, which Long forwarded to Foothills requesting approval (collectively, the "2017 Maps"). The first 2017 Map showed ten lots on the Property, and the second and third 2017 Maps showed eight lots on the Property. The concept of an eight lot plan was neither requested nor approved by Foothills. None of the three 2017 Maps was submitted to the Foothills Board. The 2017 Maps did not show any driveways or underground utilities locations, which Long acknowledged would be necessary for any approval of RSAs under Section 4(d) of the Easement. Furthermore, the RSAs on the third 2017 Map covered virtually the entirety of each lot. As of the end of October 2017, Michael Parish, the Chairman of Foothills' LPC, told Long the position of the LPC was that Placemakers' plan was "not specific enough for us to recommend." Parish anticipated that Placemakers would present a development plan setting forth more specific building areas.

By an email to Parish and Clabough dated March 19, 2018, Long submitted another map from Ayres requesting review and approval by Foothills.[3] The map attached to the email, however, was not a "revised" layout at all; rather, it was an identical copy of the third 2017 Map, showing the RSAs taking up essentially the entirety of each of the eight lots. Long confirmed that this map failed to reveal the "more specific and smaller permissible building areas" Foothills "had said that they needed." By an email dated April 9, 2018, Long sent to Parish and Clabough a map dated October 30, 2017, with a

---

[3] By then, Ayres was calling the project "Creekside Estates."

"Revisions" date of April 9, 2018 ("April 9, 2018 Map"). This map, however, was virtually identical to the third 2017 Map, with the RSAs occupying the "maximum area that could be covered on the lot." The maps submitted by Placemakers in 2018 were not approved by Foothills.

By email of August 3, 2020, to Long, Ayres sent a map which he claimed "updated the development plat," which Long forwarded to Clabough. The August 3, 2020 map, however, was the same as the third 2017 Map and the 2018 Maps, showing virtually the entirety of each of the eight lots covered by the proposed RSAs, and failing to address no-build areas, green space and specific sites. Parish responded to Long, reminding him of the previous requests for revision of site plans "to indicate much more precisely where each home would be built in order to show us that the conservation values and purposes listed in the (Easement) would be protected," and listed among the "primary values and purposes" the "scenic view from McFee Road; large natural area; preservation of open space and preservation of the natural habitat." Parish indicated that the plat submitted has "virtually all of the McFee Rd frontage filled with buildable area." Thereafter, Long responded to Parish by email of August 13, 2020, stating that a "revised proposal is being worked on to present to you."

In an email to Long, dated September 2, 2020, Ayres sent a "new map for Creekside Estates" ("Creekside Map"), stating that "in response to the requests of Foothills, we have substantially increased the building setbacks off of McFee Road and between each lots (sic)." Long forwarded the September 2, 2020 email to Parish on the same date, stating, "Just received. Are you available this week or next to discuss and get back to Joe? Look's (sic) like some progress is being made." The Creekside Map attached to those emails is titled "Boundary Survey of Property of Creekside Estates Partnership McFee Road Farragut, TN" and is dated August 28, 2020. The map, however, did not show the location and dimensions of driveways or underground utilities or the dimensions of the RSAs, which are required by Section 4(d) of the Easement. The Creekside Map did revise the previous maps submitted to reduce the RSAs; however, as Parish testified, the reduction of the RSAs shown on the map "only marginally reduced the footprint of the RSA and not nearly to the extent it protected the conservation values as what we had requested"; "it seemed to us to be apparent that those larger RSAs still negatively impacted the conservation values"; "still blocked most of the frontage of McFee Road; and the lot coverage was still way beyond what we had hoped for." Ayres testified that it is Creekside's position that the September 2, 2020 emails with the Creekside Map attached was the written notice to Foothills prior to exercising Creekside's reserved rights as required by Paragraph 5(a) of the Easement.

Following an inspection of the Property on September 9, 2020, by Clabough and Parish, Clabough sent an email to Long commenting on the Creekside Map. He remarked after noting the Property's conservation values, including "ecological, natural, scenic, forested, open land, and wildlife habitat," that "collectively we are concern (sic) that

building 8 houses that could have swimming pools, tennis courts, garage, and ect. (sic) would destroy all of the above conservation values." He noted language in the Easement stating that any exercise of reserved rights "resulting in any material adverse effect on any of the conservation purposes or conservation values will not [be] allowed." By September 9, 2020, Parish believed that "Creekside's proposed development as shown on the Creekside Map would be clearly destructive of the Conservation Values and Conservation Purposes of the Easement and clearly prohibited by the terms of the Easement." Parish observed that "[t]he RSAs are taking up a substantial portion of the McFee Road frontage. So they definitely destroy the scenic view from McFee Road. There's virtually no open space. So the large natural area is destroyed. The fact that the RSAs are so deep, there is very little wildlife habitat remaining." Parish "participated in the decision by Foothills to engage Karin Heiman, an independent biologist, to give an independent decision on the effects that the approval of the Creekside Map would have on the conservation values and purposes of the Easement."

In response to Clabough's September 9, 2020 email, Long sent emails to Clabough, Parish, and Ayres acknowledging a conflict of interest but offering to give both parties a legal opinion as to the terms of the conservation easement and how its restrictions work vis-à-vis the reserved rights permitting the building of up to 10 houses. It appears Long later suggested that Ayres "may want to ask if you can replace (Foothills) with another qualified land trust."

On September 15, 2020, Clabough sent Long an email on behalf of himself, Parish, and Dan Barnett, a Foothills Board member, addressed to Ayres, which states in part:

> Section 5(a) and 5(b) of the conservation easement document addresses in the event of a land owner requesting to exercise a reserved right and the process the Foothills Land Conservancy's Board and Staff must followed [sic] to determine if any conservation values or purposes are adversely effected [sic] by the purposed [sic] development plan presented to the Conservancy. This email acknowledges the receipt of the purposed [sic] development plan. Also as of September 15th, 2020 the Board of Foothills Land Conservancy has not reached a decision on your request. We have hired an independent biologist to help the Conservancy to make a decision on your development proposal. Staff along with the Board member that was ask [sic] by the Board to help with the decision will make a recommendation to the appropriate committee and entire Board at the October board meeting. We will inform you of the decision by the Board.

According to Clabough, he met with Ayres regarding the Property on October 1, 2020, in an attempt to give Ayres an opportunity to make any final suggestions regarding changes in the Creekside Map or development plan, as it was his opinion that the Creekside Map would not be approved by the LPC and the Foothills Board. Despite the personal

opinions of Parish and Clabough, Foothills allowed Ayres to make a presentation to the LPC at its October 8, 2020 meeting, with the "Board at large" also present. After Ayres made both an oral and written presentation of the development plan shown on the Creekside Map, the minutes of the LPC meeting reflect that the plan as presented was denied and the Foothills Board of Directors' minutes indicate the plan was not approved. Parish recalled that it was discussed at the meeting of the Board that the "plan was clearly destructive."

At the invitation of Steve Arnett, a Foothills Board member, Ayres and his son met with Arnett and Clabough on October 10, 2020, at which time Ayres testified that "Clabough informed me that our plan was not going to fly and that maybe we should look at reducing the number of residence structure areas." According to Ayres, however, he believed that he had approval to proceed with the Creekside Map because Foothills neither granted nor denied the request within thirty days from Ayres' September 2, 2020 email. Accordingly, on or around October 21, 2020, Creekside recorded the Creekside Map in the Knox County Register's Office and sold Lot 6 to Chad A. Lankford and his spouse, Bianca B. Lankford (collectively the "Lankfords").[4]

Foothills filed its "Complaint for Declaratory Judgment and Additional Relief" on May 28, 2021, seeking a declaration that it is entitled to disapprove and prohibit the development of the Property by Creekside. Thereafter, Creekside filed a counterclaim seeking a declaration that Foothills is deemed to have granted approval of the Creekside Map pursuant to Paragraph 5(b) of the Easement. After Creekside's motion for summary judgment was denied, trial was held on July 11, 12, and 13, and September 6 and 7, 2022, with the final argument on October 24, 2022.

At the trial, Creekside called David Jackson as an expert witness. Jackson has a bachelor's and master's degrees in geology and is a registered professional geologist and a certified professional hydrologist with a groundwater emphasis. He opined that Creekside's development plan for the Property depicted on the Creekside Map would result in "no harm at all to any of the Conservation Values or Conservation Purposes" of the Easement. According to Jackson, the home sites depicted on the Creekside Map would not diminish the wetland and spring, which are the most significant attributes of the Property, the wildlife habitats, or the open space attributes of the Property when considered in contrast with the surrounding densely-built subdivision and the open space left by preserving the wetland and spring. Foothills asserted that Jackson had no experience in evaluation of residential subdivisions involving conservation easements, other than his work involving the Property. Jackson acknowledged that prior to this case, he had never testified in any court proceeding involving conservation easements and had no experience regarding siting or location of homes on property subject to a conservation easement. He

---

[4] The Lankfords are named as defendants as a result of their ownership interest in the Property. At trial, the Lankfords called no witnesses, presented no proof, and did not examine any witnesses.

further admitted at trial that he could not cite any Tennessee statute referring to or governing conservation easements. When Jackson wrote his report for Creekside, he had no previous experience involving analyzing or applying any federal statute or regulations applicable to conservation easements.

Foothills utilized Edward Lloyd Raleigh as an expert witness, a conservation biologist with degrees from the University of South Carolina and Yale University's School of Forestry and Environmental Studies. Raleigh testified that he has written baseline documentation reports and ecological management plans for conservation easements; has performed work as a regional ecologist doing management plans for the islands region in Massachusetts, including Martha's Vineyard and Nantucket; has worked with conservation easements in China and in east Tibet for the World Wildlife Fund; and has worked with many other conservation groups in monitoring their conservation restrictions or easements. He described experience with the siting of building envelopes on conservation easement properties; determining how the conservation values of the sites could best be preserved, and training board members and staff of conservation organizations on how to conduct monitoring of conservation easements. Raleigh claimed to have worked on approximately 17,000 acres of baseline documentation reports since 2013 for various land trusts involving management recommendations of conservation easement areas.

Raleigh testified that the Creekside development depicted "looks just like a residential development" and opined that he would not "consider it viable for a conservation easement." He related that although there would be "open spaces" between the RSAs, with the equal spacing of the RSAs on the highest end of the fragmentation spectrum there would be no significant, threshold scenic view of benefit to the public. He testified that such construction would have a "devasting impact on the scenic views for everybody in that area." Raleigh noted that his opinion also took into account the fact that the Regulations attach significance to the interference to the panoramic view from a public roadway, in this case primarily McFee Road. His opinion regarding the "clearly destructive" impact on the scenic view Conservation Purpose took into account the fact that the combined front boundaries of the RSAs on the Creekside Map would take up 60.5% of the total of McFee Road bordering the Property.

Raleigh observed that the clustering design is "basically well known among experts" to be "much better in terms of protecting the conservation values of the community for the public benefit," because "it allows the other areas to be open space" and provides "some scenic views that can be protected." He opined that "it could be possible" to have a clustered type development on the Property that would "minimize the impacts below a certain threshold," and that a clustered development on 2.71 acres as shown in the Appraisal Report might "pass muster." He noted that the development plan as shown on the Creekside Map would be "clearly destructive" of the open space Conservation Purpose as a result of the fragmentation at the "highest end of the spectrum that I could image." He testified that the fragmentation presented by eight evenly spaced residence structures across

the Property would clearly destroy the open space Conservation Purpose, because there would remain no "significant public benefit." Raleigh asserted that the implementation of the development plan shown on the Creekside Map would render the purpose of the Easement impossible to accomplish, because it "crosses the threshold of the Conservation Values being destroyed," noting that the purpose of the Easement is "intertwined inseparably" with those Conservation Values.

The trial court filed its Memorandum Opinion on January 31, 2023, granting relief to Foothills and dismissing Creekside's counterclaim. The court held that (1) development of the Property pursuant to the Creekside Map is prohibited; (2) the Creekside Map is of no force or effect; and (3) Foothills is awarded its damages, expenses, and attorney fees. On October 27, 2023, the trial court entered its Final Order and Judgment, wherein it granted Foothills a judgment against Creekside in the amount of $231,167.47 for attorney fees, expert fees, and expenses.

The trial court agreed with the testimony of the expert for Foothills "that Creekside's proposed development would be clearly destructive of the Conservation Purposes." The court found that "Creekside's proposed plan is clearly prohibited by the terms of the Easement." The court determined that Creekside was "not authorized to proceed with the proposed 8 estate lot development of the property." As observed by the trial court:

> The court has already found that the proposed development would be prohibited by the terms of the Easement or clearly destructive of the Conservation Purposes. Therefore, Foothills' granting or withholding of approval for the proposed development would, in effect, not be required by the Easement for prohibition of the development. Moreover, with the proposed development being prohibited by the terms of the Easement or clearly destructive of the Conservation Purposes, the proposed development is prohibited irrespective of any such determination by Foothills. With that substantive finding, there is no reason to revisit whether Foothills could reasonably determine that the proposed development would be inconsistent with the Conservation Purposes, detrimental to the Conservation Values, or prohibited by or inconsistent with the restrictions ….

Despite Creekside relying upon Foothills' failure to give written notice of its withholding of its approval as "deemed" approval or approval by default under the Easement, the court determined that Creekside never provided a written request or notice and never provided information sufficient to trigger approval of its proposed development by default under the Easement.

## II. ISSUES

We restate the issues raised by Creekside on appeal as follows:

- 12 -

a. Whether the trial court erred, as a matter of law, in interpreting the Easement and Creekside's proposed exercise of a reserved right.

b. Whether the trial court erred in finding Creekside's proposed action, as depicted on the Creekside Map, is clearly prohibited by the terms of the Easement or would be clearly destructive of the Conservation Purposes:

    (1) Whether the trial court erred in considering the Appraisal Report; and

    (2) Whether the trial court erroneously relied upon Raleigh's testimony as to whether Creekside's proposed action would qualify for a deductible charitable contribution.

c. Whether the trial court erred in finding the Creekside Map is not deemed approved:

    (1) Whether the trial court erred in finding that Creekside never provided a written request or notice sufficient to trigger approval by default under Paragraph 5(b) of the Easement; and

    (2) Whether the trial court erred in finding that Creekside waived its right to deemed approval or is estopped from receiving deemed approval.

d. Whether the trial court erred, as a matter of law, in awarding Foothills its attorney fees and costs.

Foothills requested that it is entitled to recover from Creekside the attorney fees and expenses that it has incurred in connection with Creekside's appeal.

## III. STANDARD OF REVIEW

Our review of the findings of fact by the trial court in a bench trial is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Questions of law are reviewed de novo, with no presumption of correctness. *Id.*; *Moore v. Lee*, 644 S.W.3d 59, 63 (Tenn. 2022).

- 13 -

# IV. DISCUSSION

## Issues a & b

Creekside asserts that the Easement was created encumbered by the right to construct ten residential structures. Creekside argues that the trial court erred in its specific finding of fact that the development plan submitted by Creekside, as shown on the Creekside Map, is clearly prohibited under the Easement and clearly destructive of the Conservation Purposes.

Creekside acknowledges Foothills' authority to review the proposed manner of exercise and to reject proposals deemed materially adverse to the Conservation Purposes. However, it contends Foothills' authority to reject a proposal must be reasonable and provided in writing within thirty days of the request for approval in order to avoid being deemed as approved. Creekside admits that its right to deemed approval is tempered by the caveat that any action which is clearly prohibited by the Easement or would be clearly destructive of the Conservation Purposes will not receive such approval.

Paragraph 5(b) of the Easement comes into play when Foothills' approval is required as set forth in Paragraph 4; Foothills will grant or withhold its approval in writing within thirty days of its receipt of Creekside's request. Such approval may be withheld only upon the reasonable determination that the action as proposed "would be inconsistent with any of the Conservation Purposes of this Easement, detrimental to the Conservation Values of this Easement, prohibited by or would be inconsistent with the restrictions set forth in this Easement." If Foothills does not approve or withhold approval of the requested action within thirty days of receipt of Creekside's written request therefor, Foothills is deemed to have granted approval of such requested action and Creekside is expressly authorized to proceed "EXCEPT WHERE the requested action is clearly prohibited by the terms of this Easement or would be clearly destructive of the Conservation Purposes." (Capital letters in the original; emphasis added). In other words, and as found by the trial court, "the Easement contains an expressed exception or proviso that this procedure for approval, by default, does not apply where the requested action is clearly prohibited by the terms of the Easement or would be clearly destructive of the Conservation Purposes. No such prohibitive or destructive action is permissible and no authority for such prohibitive or destructive action exists irrespective of what either party to the Easement has done or not done."

Creekside correctly asserts that it has reserved rights under the Easement permitting it to establish ten RSAs. However, the Easement does not permit Creekside to establish ten RSAs in any manner it may choose; indeed, in establishing the RSAs, Creekside must comply with the terms of the Easement, including securing the consent of Foothills. Creekside's reserved rights must conform to the requirements of the Regulations. A

deduction will not be allowed if the terms of the Easement "permit a degree of intrusion or future development that would interfere with the essential scenic quality of the land . . ." or "if the contribution would accomplish one of the enumerated conservation purposes but would permit the destruction of other significant conservation interests." Paragraphs 4(o), 5(b), and 5(e) of the Easement provide that there is no assurance that the reserved rights for which Foothills' consent is required may be exercised in the manner proposed by Creekside, and that the reserved rights for which Foothills' consent is required may not be exercised unless and until Foothills is satisfied that the exercise of the reserved right in the manner proposed by Creekside can be done without an adverse or detrimental effect on the Conservation Purposes, Conservation Values, or other significant ecological values of the Property, or prohibited by or inconsistent with the restrictions set forth in the Easement.

Paragraph 4(o) of the Easement directs that Creekside "may not exercise any of their rights reserved under this Easement in such a manner to adversely impact the Conservation Values of the Property." The Conservation Values of the Property are adversely impacted when Creekside exercises its reserved rights in a manner which is clearly destructive to the Conservation Values of the Property, as established by the testimony of Foothills' expert. This is best illustrated by the Potential Lot Layout of the Appraisal, showing ten RSAs sited on 2.71 acres of the Property, which obviously satisfied the requirements of the Regulations, as evidenced by the approval of Placemaker's charitable deduction by the IRS. However, Creekside did not desire to pursue the development of the Property in accordance with the Potential Lot Layout, or anything similar to it. Rather, Ayres knew he had "to submit something to Foothills for approval but we were hoping we could maximize our deedable acreage to potential purchasers." Clearly, selling eight lots containing five acres each is more profitable than selling ten lots all sited on 2.71 acres. As argued by Foothills, the crux of this dispute is not that the Property could not be developed in accordance with the terms of the Easement; rather, it is that Ayres could not make as much money by developing the Property in accordance with the terms of the Easement.

Based on the testimony of Raleigh, Foothills' expert, the trial court properly found and concluded that the Creekside Map is prohibited by the terms of the Easement and would be clearly destructive of the Conservation Purposes; therefore, Foothills is not deemed to have granted approval of the proposed development and Creekside is not authorized to proceed with the proposed development. Creekside's Issue a is without merit.

In the next issue, Creekside asserts that the trial court was in error in considering the Appraisal as evidence of the parties' intent. Creekside asserts that "[e]vidence which is not relevant is not admissible," and relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Tenn. R. Evid. 401-402. Creekside notes that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

evidence." Tenn. R. Evid. 403. Citing *Biscan v. Brown*, No. M2001-02766-COA-R3-CV, 2003 WL 22955933 (Tenn. Ct. App. Dec. 15, 2003), affirmed 160 S.W.3d 462 (Tenn. 2005), Creekside states that a trial court's decision to admit or exclude evidence rests within its sound discretion such that "trial courts are accorded a wide degree of latitude in making such determinations, and will be overturned on appeal only upon a showing of abuse of discretion" such as "appl[ying] an incorrect legal standard, or reach[ing] a decision which is against logic or reasoning or that causes an injustice to the party complaining." *Id.* at *11 (internal citations omitted). We find no abuse of discretion in the instant case.

The amount of the charitable deduction obtained by Placemakers is relevant. The fact that Ayres reviewed the Appraisal before it was submitted to the IRS, did not ask for any changes to it, and under penalty of perjury signed the Placemakers 2007 federal tax return, to which the Appraisal was attached in support of the $3,725,000.00 deduction, is also relevant. Additionally, the Potential Lot Layout of the Appraisal is relevant and probative because it shows that the Property can be developed with ten RSAs in a manner which is not prohibited by the Easement nor destructive of it. It is significant that the Potential Lot Layout of the Appraisal satisfied the requirements of the Regulations, as evidenced by the approval of Placemakers' charitable deduction by the IRS. No prejudice to Creekside has been demonstrated by the admission of the Appraisal. Any error would be harmless and would not justify the reversal of the trial court's rulings. *See* Tenn. R. App. P. 36(b). We find this issue to be without merit.

**Issue c**

Another issue raised by Creekside is that the trial court erred in finding that Creekside's proposed plan of development is not deemed approved. In its opinion, the trial court held as follows:

> Creekside never provided a written request or notice and never provided information sufficient to trigger approval of its proposed development by default under the Easement. Additionally, the easement requires that any such notice "be served personally or sent by first-class mail, postage prepaid …." The writing relied upon by Creekside was sent by email. The email does not expressly request approval of the attached map. The email does not set forth, and Creekside had not otherwise provided, the "location and dimensions of a road or driveway and underground utility facilities proposed to serve each of the Residence Structure Areas," for review and approval by Foothills.
>
> * * *
>
> Moreover, even if the proposed development was not clearly prohibited by

- 16 -

the terms of the Easement or would not be clearly destructive of the Conservation Purposes, Creekside never provided the information and notice, sufficient in content, form and manner, to trigger the default provision of the Easement for deemed approval of Creekside's proposed development.

The Easement requires that notices be in writing and be personally served or sent by first class mail. The September 2, 2020 email sent by Ayres to Long, who then forwarded it to Foothills, is what Creekside claims is the applicable notice. Because it was neither personally delivered nor mailed by first class mail, Ayres' September 2, 2020 email is not proper notice.

Further, Paragraph 4(d) applies to requests for approval of the location and dimensions of each RSA; additionally, it also applies to requests for approval of the location and dimensions of a road, driveway, and underground utility facilities proposed to serve each of the RSAs, all of which locations and dimensions shall be identified and surveyed by Creekside and such survey information provided to Foothills before Foothills' approval is granted, as provided by Paragraph 4(d)(iii). The Creekside Map before us does not depict, as required, the location and dimensions of roads, driveways, or underground utilities, nor does it show the dimensions of any of the RSAs. Ayres' September 2, 2020 email does not make or contain any request for approval.

Accordingly, Creekside did not send notice, and even if Ayres' September 2, 2020 email is considered proper notice for purposes of Paragraph 15 of the Easement, it did not request approval and it did not contain the required information. Thus, the Ayres' September 2, 2020 email was not a proper request under Paragraph 5(a) of the Easement and did not require any response from Foothills under Paragraph 5(b) of the Easement, so that Foothills could not have been deemed to have given its approval by default. We further find unpersuasive Creekside's claim that Foothills waived strict compliance with the notice provisions of Paragraph 15 of the Easement when Clabough sent an email to Long, dated September 15, 2020, with the request that Long forward it to Ayres.

We note that in Clabough's September 15, 2020 email, he informed Ayres that the Foothills Board had not reached a decision on his request, that Foothills had hired an independent biologist to help it make a decision on the development proposal, and that staff and an assisting board member will make a recommendation to the entire Board at the October board meeting. If Ayres's September 2, 2020 email satisfies the requirements of Paragraphs 4, 5, and 15 of the Easement, then Clabough's September 15, 2020 email to Ayres satisfies the provisions of Paragraph 5(b) of the Easement inasmuch as it informs Ayres that Foothills is withholding its approval, which was admitted by Ayres when he stated that Clabough's September 15, 2020 email indicated to him that Foothills' decision on the Creekside Map was being deferred or postponed. Foothills therefore complied with its obligations under Paragraph 5(b) of the Easement by advising Creekside within thirty days of its decision to withhold approval, and there is no basis for Creekside to say that the

Creekside Map is deemed approved. Creekside's Issue c is without merit.

**Issue d**

Creekside lastly argues that Foothills is not entitled to an award of attorneys' fees. Initially, Creekside asserted that Foothills did not request attorneys' fees with specificity, contending that Foothills' complaint contains no direct reference to any contractual, statutory, or other substantive provision which would provide a basis for the recovery of attorneys' fees. We find that there are a number of references to attorneys' fees and/or legal fees recoverable by Foothills in the Conservation Easement. Those references arise in Sections 5(d), 6(c), 6(f), 8(g), and 8(h) of the Easement. Ayres, having signed the Easement in 2007, thereby adopting each and every provision set forth therein, and having included the Easement with Placemakers' federal income tax return thereby further adopting the provisions of the document to his ultimate benefit given his 99.8% partnership interest, cannot claim to be unaware of the contents thereof and that attorneys' fees may be recoverable by Foothills. Therefore, even had Foothills failed to include specific references to attorneys' fees in its complaint, such failure would not be fatal to Foothills' recovery of those fees, given that the parties were aware that attorneys' fees may be recovered per the wording of the Easement.

In this action, Foothills alleged that "the construction of the Residence Structures on the Residence Structure Areas shown on the Creekside Map are inconsistent with, and prohibited by, the purpose of the Easement, including the Conservation Values and Conservation Purposes, and that any such development would constitute a violation of the terms of the Easement, **entitling (Foothills) to exercise any or all of its remedies set forth in the Easement, including but not limited to those set forth in Section 6 of the Easement**, titled 'Grantee's Remedies.'" (Emphasis added). Paragraph 6 of the Easement declares Foothills' entitlement to both "attorneys' fees" and "legal fees,"[5] and is a specific reference to a contractual basis for the recovery of attorneys' fees. Foothills further asserted that the court should award such injunctive relief and/or damages as to which (Foothills) may show entitlement, **including all reasonable expenses incurred, including legal fees**." (Emphasis added). As noted by Foothills, the last phrase of paragraph 44 is a direct quote from paragraph 6(c) of the Easement – "all reasonable expenses incurred, including legal fees." Furthermore, in paragraph 4 of its prayers for relief, Foothills requests "that

---

[5] Included in Section 6 of the Easement is Subsection 6(c), titled "Damages," which provides that "if a court of competent jurisdiction determines that a violation has occurred hereunder, the owner shall reimburse Grantee, as applicable, for all reasonable expenses incurred, including legal fees whether in or out of court .... "Likewise, Subsection 6(f) of the Easement, titled "Costs of Enforcement," provides:

> All reasonable, actual costs incurred by Grantee in enforcing the terms of this Easement against Grantor, including, without limitation, actual costs and expenses of suit, actual, reasonable attorneys' fees, and any costs of restoration necessitated by Grantor's violation of the terms of this Easement shall be borne by Grantor ….

- 18 -

this Court award (Foothills) damages, expenses, **and attorneys' fees**, in an amount to be shown at a hearing or hearings for such purpose." (Emphasis added). Given the plain language, as well as the specific reference to "legal fees" in paragraph 44 of the complaint and the request for attorneys' fees in paragraph 4 of Foothills' prayers for relief, Creekside's contentions on this issue lack merit.

Creekside also asserts that the action is only for declaratory relief and is not an action for the enforcement of the Easement; thus, Creekside contends that this matter does not come within the provisions of Paragraph 6 of the Easement. We disagree.

Paragraphs 11 and 13 of the complaint make reference to Foothills' "right to enforce" the terms and conditions of the Easement and that "(Foothills) is required, both by law and by contract, to enforce the limitations and affirmative obligations of the document so as to preserve, maintain, or enhance the natural beauty, the open-space value, the air and water quality, and the scenic resources of the land." Paragraph 13 of the complaint provides that "(Foothills) is required to undertake this enforcement obligation in perpetuity." Further, in paragraph 40 of the complaint, Foothills alleges that Creekside's specific development plan and the construction of residence structures as shown thereon, are inconsistent with, and prohibited by, the purpose of the Easement, and that any such development would constitute a violation of the terms of the Easement. Foothills sought in its prayers for relief that the trial court "declare the rights, status, or other legal relations of the parties under the Easement, and enter a declaratory judgment thereon, declaring (Foothills') right to disapprove and prohibit Creekside's development plan as shown on the Creekside Map." Accordingly, Foothills was attempting to enforce the Easement terms specifically to prohibit development under Creekside's development plan at issue. We agree with the trial court's finding that Foothills was seeking to obtain enforcement—not only interpretation—of the Easement. As noted by the trial court, "Foothills, as plaintiff, brings this action to, among other things, prohibit development proposed by Creekside …."

Creekside additionally claims that Foothills never provided it with written notice of any purported violation of the Easement and a right to cure the same, as provided for in Section 6(a) of the Easement. Creekside therefore asserts that Foothills cannot recover attorneys' fees pursuant to Section 6 of the Easement. Foothills responds that its alleged failure to give notice of a violation of the Easement and a right to cure pursuant to Section 6 of the Easement was an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure. Because Creekside did not raise this affirmative defense in its answer, Foothills asserts that the affirmative defense of lack of notice was waived. The trial court agreed.

Pursuant to Rule 8.03, Creekside was obligated to assert all of its affirmative defenses in its answer. Although Creekside asserted certain affirmative defenses, lack of notice is not among them. We agree with the trial court that this affirmative defense, as an alleged bar to Foothills' claim for attorneys' fees, was waived.

The plain language of Foothills' complaint clearly and specifically gave notice to Creekside that Foothills was seeking to recover attorneys' fees pursuant to Section 6 of the Easement. Alternatively, Foothills' alleged failure to give notice has been excused, given the extensive record of communications regarding the disputed subject matter between Foothills and Creekside, beginning in 2017 and running through 2020. As the trial court observed:

> Putting aside the technicalities of the Easement used by both sides to fortify their positions, **Creekside had no cause to believe anything, at any time material to this case, but that Foothills was withholding its approval of Creekside's plan of development as presented.**

(Emphasis added).

Foothills' complaint satisfies all of the notice requirements set forth in Paragraph 6 of the Easement. Paragraph 6(c) specifies that the form of the notice shall be a "written instrument." The complaint is a written instrument that was personally served on Joseph K. Ayres, Creekside's general partner, at 918 Cherokee Boulevard, Knoxville, Tennessee. The personal service of the complaint on Ayres satisfies the notice provision set forth in Paragraph 15 of the Easement, the formal "Notice" provision, which says notice to Creekside must be in writing and served personally or by first class mail to the attention of Ayres at 918 Cherokee Boulevard, Knoxville, Tennessee, the address where Ayres, as Creekside's general partner, was personally served with the summons and the Complaint. Therefore, to the extent "Notice" was not waived by Creekside's failure to set forth lack of notice as an affirmative defense in its answer, or was not excused, the service of the complaint on Ayres fully satisfies any such notice requirement.

As it is clear that Foothills demonstrated its entitlement to attorneys' fees and expenses on the basis of paragraphs 6(c) and 6(f) of the Easement, those provisions of the Easement also entitle Foothills to recover the attorneys' fees and expenses that it has and will continue to incur in connection with Creekside's appeal.

As Creekside has not prevailed in its appeal, there is no reason for the matter to be remanded to the trial court for a determination that Foothills is entitled to the alternative relief asserted in paragraphs 41-43 of its Complaint for Declaratory Judgment and Additional Relief, that being that the trial court should terminate or extinguish the conservation easement in accordance with its terms.

## V. CONCLUSION

For the reasons stated above, we affirm the decision of the trial court. The case is remanded for a determination of the amount of attorneys' fees and expenses Foothills Land Conservancy is entitled to recover from Creekside as a result of this appeal and for any further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Creekside Estates Partnership.

_____
JOHN W. MCCLARTY, JUDGE